[DO NOT PUBLISH]

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

No. 04-15852

_____

D.C. Docket No. 03-CV-22821-CV-UUB

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 14, 2006
THOMAS K. KAHN
CLERK

SHANA DOMINGUEZ,

Plaintiff-Counter-
Defendant-Appellant,

versus

METROPOLITAN MIAMI-DADE COUNTY,
ONE UNKNOWN DEFENDANT,

Defendants-Appellees,

TRACY GOLUB,

Defendant-Counter-
Claimant-Appellee.

_____

Appeal from the United States District Court
For the Southern District of Florida

_____

**(February 14, 2006)**

Before TJOFLAT and BARKETT, Circuit Judges, and MILLS[*], District Judge.

MILLS, District Judge:

## I. FACTS

In October 2000, police received a tip that an illegal drug lab existed at an address in Miami-Dade County where Appellant Shana Dominguez resided. Detective Roy Rutland contacted a confidential informant ("CI") who was registered with the Miami-Dade Police Department, proven reliable, and familiar with the area where the drug lab was alleged to be. The CI confirmed that Dominguez resided at the address and verified that she used and sold cocaine. On instructions from Det. Rutland, the CI bought cocaine from Dominguez at her residence.

Det. Rutland told the CI to buy more drugs from Dominguez and to arrange for the transaction to take place December 14, 2000, at 11:00 p.m. at a shopping center in the vicinity of South Dixie Highway and 184th Street. Dominguez arrived in the shopping center's parking lot at that date and time. Once Det. Rutland positively identified Dominguez, he ordered the CI to call off the transaction so the CI's identity would not be compromised. Dominguez then

___

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

circled the parking lot and departed. Soon after Dominguez left the parking lot, Det. Rutland had a uniformed police officer stop her truck. A trained narcotics dog was brought to the scene and it alerted to the odor of drugs in Dominguez's truck and her pelvic area.

The police requested that two female officers respond to the scene to search Dominguez. Officers Tracy Golub and Diana Fuentes directed Dominguez to an area behind a dumpster to afford her privacy from the male officers' view. The male officers could only see Dominguez's head from where they were standing. However, Dominguez claims that two civilians in the parking lot had "total view."

Officer Golub put on gloves and reached under Dominguez's shirt and began a pat down. Officer Golub ran her hands over Dominguez's breasts and down Dominguez's body. She reached beneath Dominguez's shorts and used Dominguez's underwear to "floss"[1] her buttocks and vaginal area. Officer Golub did this in order to discover drugs that Dominguez may have been hiding. At the time of her deposition, Dominguez alleged that Officer Golub "flossed" 4-5 times and did so forcefully enough to enter Dominguez's rectum and "hurt her insides." Later, in an affidavit in opposition to summary judgment, Dominguez asserted that Officer Golub "flossed" her 8-10 times.

---

[1] The term "flossed" is Defense counsel's term.

Dominguez informed Officer Golub that she was wearing a sanitary pad and Officer Golub told her to remove it. Dominguez did so and asked Officer Golub if she should tear it in half. Officer Golub said yes, and Dominguez tore the pad in half to show that it did not contain drugs. Police found no drugs during any part of the search. Although Dominguez experienced "discomfort" during the search, she did not ask for medical treatment before she was allowed to leave.

Later that night, Dominguez noticed blood that she assumed was due to menstruation. After experiencing "spotting" the next few days, Dominguez noticed blood in the toilet. She believed she was bleeding from her rectum. She went to see her doctor. In his examination, Dominguez's doctor discovered no bleeding, abrasions, or trauma. Dominguez's doctor believed that the bleeding could have resulted from Dominguez's internal hemorrhoids.

Dominguez sued Metropolitan Miami-Dade County (the "County") and Officer Golub for violating her Fourth Amendment right to be free from excessive force. She also claimed that Officer Golub did not have exigent circumstances to conduct a warrantless body cavity search. The County and Officer Golub moved for summary judgment and the district court ruled in their favor. The district court held that excessive force was not used. It also concluded that the police were justified in performing a warrantless search.

## II. STANDARD OF REVIEW

The Court reviews the district court's entry of qualified immunity *de novo*.

See Lambert v. Fulton County, Ga., 253 F.3d 588, 596 (11th Cir.2001). The Court

views the facts in the light most favorable to Dominguez because she was the non-

moving party. See Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925-26 n.

3 (11th Cir.2000) (when reviewing a summary judgment order, the appellate court

must construe all facts in a light most favorable to the non-moving party).

## III. ANALYSIS

### A. Qualified Immunity

In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001),

the Supreme Court formulated a two-step qualified immunity analysis. Under the

Saucier approach, the Court first asks if the facts alleged, taken in the light most

favorable to the plaintiffs, show that Officer Golub's conduct violated

Dominguez's Fourth Amendment rights. Id. at 201, 121 S.Ct. at 2156. Second, if

the Court concludes that Officer Golub violated Dominguez's constitutional

rights, the Court determines whether those rights were clearly established such

that at the time of Dominguez's seizure, a reasonable officer would have known

that Officer Golub's actions were unlawful. Id. at 202, 121 S.Ct. at 2156. To

determine whether a right is clearly established under the second step, courts

examine cases that articulate constitutional rules of general application as well as those cases that apply these general rules in circumstances similar to those encountered in the case at hand. See Vinyard v. Wilson, 311 F.3d 1340, 1350- 52 (11th Cir.2002). In so doing, courts are not to be unduly rigid in requiring factual similarity between prior cases and the case under consideration. The "salient question" is whether the state of the law gave the official "fair warning" that the alleged conduct was unconstitutional. See Hope v. Pelzer, 536 U.S. 730, 740-41, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002).

In an excessive force case, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer ... to conclude the force was unlawful." See Slicker v. Jackson, 215 F.3d 1225, 1232 (11th Cir. 2000) (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir.1993), modified 14 F.3d 583 (11th Cir.1994)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In determining whether an officer's use of force was objectively reasonable, the Court considers a variety of factors including "(1) the need for the

application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." See Slicker, 215 F.3d at 1233 (quoting Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir.1986)).  The Court also considers "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing." See Post, 7 F.3d at 1559 (citation omitted).  "Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." See Chew v. Gates, 27 F.3d 1432, 1440-41 (citations omitted).

Dominguez cooperated throughout the instant search.  Thus, the search required only so much physical force as was necessary for Officer Golub to ascertain whether Dominguez was concealing drugs.  Using a clothed suspect's underwear to "floss" the suspect's vagina and buttocks is less invasive than digital penetration and presents no obvious hygienic concerns.  "Flossing" a suspect 4-5 times[2] may cause some "discomfort", as it did to Dominguez, but a suspect's discomfort does not make a procedure excessive.  See Nolin v. Isbell, 207 F.3d

_____

[2] Dominguez stated in her deposition that Officer Golub "flossed" her 4-5 times.  In a subsequent affidavit, Dominguez asserted that Officer Golub "flossed" her 8-10 times.  "A party cannot use a subsequent affidavit to create a genuine issue of material fact." Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984).  Therefore, we accept the figure Dominguez offered in her deposition as true.

7

1253, 1257 (11th Cir. 2000) (arrest where suspect was grabbed from behind, thrown against van, kneed in back, uncomfortably searched in groin area, and bruised on forehead, wrists, and chest was *de minimis* and not constitutionally actionable). The fact of the matter is that Officer Golub's conduct was proportionate to the goal of the search. "Flossing" Dominguez 4-5 times was not unduly repetitious. Furthermore, Dominguez's own doctor determined that the "flossing" did not cause any bleeding, abrasions, or trauma. According to the doctor, the bleeding may have resulted from Dominguez's internal hemorrhoids. Also, it appears medically impossible that the "flossing" caused the underwear to enter Dominguez's rectum, as Dominguez claims.

Finally, using a gloved female officer to pat down an identified drug dealer evidences that the search was conducted in good faith. See Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir.2001) (holding that private, visual inspection of arrestee by same-sex officer was reasonable); but see Amaechi v. West, 237 F.3d 356, 359-62 (4th Cir.2001) (holding that public inspection, in front of plaintiff's house and observed by her five children and by her neighbors, by opposite-sex officer involving slight genital penetration with bare hand was unreasonable). It is unfortunate that the search was conducted in a parking lot instead of a more private area, however, this factor is not enough to tip the balance in Dominguez's favor.

8

Beyond all this, Dominguez has not identified any United States Supreme Court, Eleventh Circuit, or Florida Supreme Court caselaw that clearly establishes a Fourth Amendment violation under the circumstances presented here.  See Courson v. McMillian, 939 F.2d 1479, 1497-98 & n. 32 (11th Cir. 1991)(law can be "clearly established" for qualified immunity purposes by decisions of U.S. Supreme Court, Eleventh Circuit Court of Appeals, or highest court of state where case arose).  It was her burden to do so.

**B.  Warrantless Search**

"[A] officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot, without violating the Fourth Amendment."  United States v. Hunter, 291 F.3d 1302, 1305-06 (11th Cir.2002).  "Reasonable suspicion is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop."  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir.1990) (internal quotations and citations omitted).

In this case, the police received a tip that the house in which Dominguez resided was a drug lab.  A reliable confidential informant purchased cocaine there from Dominguez and the confidential informant arranged for Dominguez to deliver drugs to him in the parking lot at the time and date the officers stopped her.  Moreover, a drug-sniffing canine alerted to the presence of drugs in Dominguez's

9

truck and pelvic area.  Based on a totality of these circumstances, the officers had a reasonable, articulable suspicion that Dominguez was transporting drugs.  Thus, the officers were justified in their warrantless search.

## IV.  CONCLUSION

The district court correctly held that the Defendant/Appellees were entitled to qualified immunity and were justified in conducting a warrantless search.  For these reasons, the district court's decision is AFFIRMED.